## JOE MOFFATT v. THE STATE.

### No. 906.   Decided December 4th, 1895.

<div style="float:right">35  257<br>35  265</div>

**1.   Impeachment of a Witness—Contradictory Statements.**

On a trial for murder, where a witness testifies, that after the parties left the tent, he could hear them having a fight and scuffle on the outside, he may be impeached, as to such testimony, by showing that he had stated before the trial, that he did not hear any scuffle on the outside after the parties left the tent.

**2.   Testimony at Coroner's Inquest—Impeachment of Witness.**

For the purpose of impeaching a witness, his written testimony, taken at a coroner's inquest, is legitimate to prove contradictory statements, but it is not permissible to prove by parol, other contradictory statements made by the witness at the sametime, but not contained in said written testimony; it is not permissible to prove that he made any such contradictory statements at all at that time.

**3.   Evidence—Bloody Clothing—Opinion Evidence.**

On a trial for murder, it was competent to prove that defendant's clothing was found to be bloody, after the homicide. But, it was not competent to prove by a witness, who examined the clothing, that, in his opinion, "they looked like ashes had been smeared over them to hide the blood."

**4.   Murder—Charge—Manslaughter—Defense of Another.**

On a trial for murder, where it appeared that the killing was upon a sudden quarrel and after an assault had been made by deceased upon the slayer, the homicide would be manslaughter on the part of the slayer; and, a party participating in behalf of the slayer, in such a killing, would only be guilty of manslaughter, and the charge of the court should so instruct the jury.

35th Crim. Rep.—17.

**5. Same.**

On a trial for murder, where it appears that defendant interfered in a difficulty between deceased and another, in which deceased was the aggressor, and such interference was not in pursuance of a previously formed design, but more force was used by defendant than was reasonably necessary to protect the party in whose behalf he interfered, the killing would be manslaughter and the charge of the court should so instruct the jury.

APPEAL from the District Court of Bosque. Tried below before Hon. J. M. HALL.

This appeal is from a conviction for murder in the second degree, the punishment being assessed at twenty-five years' imprisonment in the penitentiary.

The opinion states the case fully.

*Lockett & Kimble*, for appellant.—1. The court erred in allowing the State witness, John Metcalf, over defendant's objection, to testify that at the inquest held in Clifton, that Moffatt testified that he heard no struggle on the outside of the tent; the State having already introduced in evidence the written testimony of Moffatt, subscribed and sworn to, and proven up as required by law as made before the magistrate holding said inquest and properly certified, could not introduce oral testimony to contradict, vary or add anything to his written statement. Code Crim. Proc., Art. 998; Greenleaf's Ev. (14 Ed.) § 227; Guy v. State, 9 Tex. Crim. App., 161; Dunlap v. State, 9 Tex. Crim. App., 179; O'Connell v. State, 10 Tex. Crim. App., 569.

2. The court erred in allowing State's witness, Sheriff Metcalf, to testify over defendant's objections—that when he first saw defendant's pants, "they looked like ashes had been smeared over them to hide the blood." This was the conclusion or opinion of the witness without any statement of the facts upon which it was based.

Our court has received opinions of witnesses, but the facts upon which the opinion was based must also be stated. McLane v. State, 30 Tex. Crim. App., 482; Thompson v. State, 19 Tex. Crim. App., 594; Kemp v. State, 28 Tex. Crim. App., 519.

For general rules on receiving opinions of non-experts, see Am. and Eng. Ency. of Law, p. 496.

Our Supreme Court holds that the following question calls for an opinion: "Was it not your own fault and carelessness that caused the injury?" H. & T. C. R'y Co. v. Reason, 61 Texas, 616.

Exceptions to the general rule that witnesses must testify to facts ought not to be enlarged so as to include new cases. Turner v. Strange, 56 Texas, 142.

3. The court erred in refusing defendant's special instruction upon manslaughter, because there was evidence requiring such a charge, and the court's charge did not submit that question to the jury. Wadlington v. State, 19 Tex. Crim. App., 274; Williams v. State, 7 Tex. Crim. App., 397; Williams v. State, 15 Tex. Crim. App., 623; Childers v. State, 33 Tex. Crim. Rep., 511; Howard v. State, 23 Tex. Crim. App.,

266; Hobbs v. State, 16 Tex. Crim. App., 523; High v. State, 26 Tex. Crim. App., 569; Coon v. Drum, 53 Penn., 1; Neyland v. State, 13 Tex. Crim. App., 549; McLaughlin v. State, 10 Tex. Crim. App., 359; West v. State, 2 Tex. Crim. App., 476; McKay v. State, 13 Tex. Crim. App., 360; Meuly v. State, 26 Tex. Crim. App., 307; Baker v. People, 40 Mich., 411; People v. Garbut, 17 Mich., 27; Maher v. People, 10 Mich., 218.

Article 86, of the Code of Crim. Proc., is as follows: "The same rules which regulate the conduct of the person about to be injured, in repelling the aggression, are also applicable to the conduct of him who interferes in behalf of such person. He may use a degree of force proportioned to injury about to be inflicted and no greater." Glover v. State, 33 Tex. Crim. Rep., 226; Guffee v. State, 8 Tex. Crim. App., 201; Sterling v. State, 15 Tex. Crim. App., 256; Dyson v. State, 14 Tex. Crim. App., 460; Liskosskie v. State, 23 Tex. Crim. App., 169; Rutherford v. State, 15 Tex. Crim. App., 236; Scott v. State, 10 Tex. Crim. App., 112; McDaniels v. State, 24 Tex. Crim. App., 558; Williams v. State, 24 Tex. Crim. App., 345.

If Moffatt and Kidwell did interfere to protect Lay from serious bodily injury and after accomplishing that purpose, they in good faith quit the fight, and Pratt renewed the fight by assaulting either of them, and the assault, considering his dangerous character in connection with the other circumstances, was sufficient to raise in defendant's mind either anger, rage, sudden resentment, or terror, so as to render it incapable of cool reflection, then if the jury so believed it would constitute manslaughter, and this issue was not submitted to the jury, it was material error. Liskosskie v. State, 23 Tex. Crim. App., 169.

Although the killing be done with deadly weapons it is not necessarily murder. Greenleaf on Ev., Vol. 3, Sec. 124, (14 Ed.); People v. Crawey, 5 Crim. Defs. 1110.

"The rule is that the court in felony cases, must apply the law by a proper charge to every conclusion deducible from the evidence, whether asked or not. If there is any evidence tending, though slightly, to establish a defense the defendant is entitled to a charge directly upon that issue, no matter what view the court may entertain of the weight and value of the testimony." Scott v. State, 10 Tex. Crim. App. 112; Liskosskie v. State, 23 Tex. Crim. App., 169; Rutherford v. State, 15 Tex. Crim. App., 236; Williams v. State, 24 Tex. Crim. App., 345.

*H. S. Dillard*, County Attorney, and *Mann Trice*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was tried in the court below under an indictment charging him with murder, was convicted of murder in the second degree, and given twenty-five years in the penitentiary; and from the judgment and sentence of the lower court he prosecutes this appeal. A number of errors are assigned, but we will discuss only such as are deemed of importance to a decision of this case.

The facts attending this homicide are of a peculiar character.    The deceased, Pratt, with the appellant, Joe Moffatt, Buck Kidwell and a Mexican boy, named Lopez, were camped on or near the Bosque river.    It appears that some of said parties had been camped there for some time, cutting wood.    On the day of the homicide, Jim Lay and Buck Kidwell went from Clifton, some three and a half miles distant, to the camp of Moffatt, for the purpose of securing work.    They had worked with said parties a short time previously.    The killing occurred a little while after nightfall, at or near the tent in which the parties were camped.    The difficulty began over a game of cards, and originated, so far as the evidence shows, between Lay and the deceased, Pratt; the latter accusing Lay of making a misdeal.    Lay and Pratt got up from where they were playing cards; Lay going out of the tent, and Pratt pursuing him.    According to the appellant's theory, the fight occurred solely between deceased Pratt and Lay, and resulted in Pratt being killed by cuts and stabs with a knife.    The State's theory was that, after the difficulty began between Pratt and Lay, Moffatt and Kidwell, in pursuance of a previously arranged plan with Lay, engaged in a fight on Lay's side, and they, Moffatt and Kidwell, themselves killed the deceased, Pratt. The evidence established that Pratt was stabbed with a knife on the left side of the breast, the wound penetrating to the interior, and being two or three inches in length, one of the ribs being cut in two, and the wound being angular in shape.    This wound alone was sufficient to have caused death.    Deceased was also shown to have been cut on the left arm, near the elbow, and also back of the neck, near the ear, and was stabbed in the back near his spinal column.    He had several bruises on his back, and a bruised place across his nose and eyes.    His nose was broken.    After the killing, it appears that Lay went to Clifton, and informed the officers of it, and confessed to the killing of deceased.    He stated that, as the deceased pursued him out of the tent, he cut him with a knife, cutting back at him, and so killed him.    He did not account for the bruises on deceased in this statement.    The other parties, Moffatt and Kidwell, also went directly to a house about three-fourths of a mile distant and reported the killing, stating that Lay had done it. Lay was tried before an examining court for the murder, and there repeated the same story he had previously told, admitting that he had done the killing himself.    The other parties, it appears, were also tried before the coroner's inquest.    They testified, swearing that Lay killed deceased, and that they did not participate therein.    Subsequent to this, Lay, by some arrangements with the prosecution, agreed to turn State's evidence; and on the trial of this case he denied his previous statements and evidence, and stated that he had been induced to that course by an agreement with the other parties, at the time of the killing, to assume the responsibility thereof, and they would assist him by their testimony to defeat the case.    Lay stated, in substance, that on the evening of the homicide, and before it occurred, Moffatt remarked that Pratt was mad, and suggested that, if he jumped on either one of them, they would

make common cause, and put him where he ought to be. His testimony as to the origin of the difficulty is not materially different from his previous statement, to-wit: That it occurred during a game of cards, and originated between himself and Pratt; that Pratt pursued him out of the tent, that when he started out of the tent, he saw Kidwell put his hand back for his knife, and Moffatt also put his hand in his pocket; that he fell outside of the tent, and Pratt fell on top of him; that Moffatt and Kidwell followed them out of the tent, and Kidwell struck Pratt on the head, and he rolled off of him; that Moffatt ran to Pratt's head; that he did not see whether he struck him then or not; that he did not see him hit him as he got up; that, when Pratt rolled off of him, he jumped up, and pulled his (Lay's) knife open off his (Lay's) hand, where it had closed, and cut him, and stood there a short while; that he saw Moffatt with a knife in his right hand and an axe handle in his left; that the parties began fighting, and he ran off twenty or thirty feet south of the tent, and stood and watched them; that he saw Pratt start at Kidwell; Kidwell backed from him, and Moffatt stood at Pratt's back; that he could hear them striking, but could not tell what they were using; after Kidwell had backed away two or three steps, Pratt said: "You have cut me, or you have killed me;" Pratt made two or three steps more, and fell by the fire; then got up, and staggered back to the tent, and fell; that, after Pratt fell, Moffatt and Kidwell came to where witness was standing, and said that they had killed Pratt. Kidwell had a dirk in his hand, carrying it with the point hanging down. They said they would go down to the river and wash off the blood, and throw the knife into the water; that they would destroy their clothes, and pour a little water on the body, to make it appear that they had tried to do something for him; that they wanted the witness to go to Clifton, and assume the killing, and tell the officers that he had done it, and that they would influence the little Mexican boy, Lopez, who would tell the same thing; that he told them he did not want to do that; they said, if he did not, they would put him beside Pratt; that he had made the first statement because they had threatened him, and he was afraid of his life. This is a sufficient statement of the case to present the bearings of the exceptions taken.

On the examining trial at the coroner's inquest, it appears that the appellant, Moffatt, in the written statement made and signed by him, stated as follows: "Pratt overtook Lay just inside the door, and Lay struck back at Pratt without turning around. I heard the lick, and the blood commenced to run. When the lick was struck, Pratt had his hands up, like he was catching at Lay. This was the only thing like a lick I saw. Lay continued on out of the tent; Pratt after him. As Lay got out of the tent, he (Lay) turned the corner, and ran as quick as he got out of the door towards the creek, and, on going to the door, I saw Pratt coming back to the door. I started to the door as soon as they (Lay and Pratt) got out." On the trial of this case, the appellant, Moffatt took the stand, and on this feature of the case, testified as follows:

"That Pratt said he would whip him (Lay) anyway. Jim Lay said he did not think he would, and got up, and started out with Pratt after him. As Jim Lay went out he struck at Pratt, and Pratt grabbed him. I could hear them having a fight outside, but did not see Pratt. After they got out of the tent, they turned and went out to one side. I could hear them out there. I testified at the inquest; I do not know whether I testified that there was a scuffle on the outside or not. My statement at the inquest was true." In rebuttal of this testimony, the witness, Metcalf, was called for the State, and, over the appellant's objection, was permitted by the court to state that he was present at the inquest at Clifton, and heard the appellant's, Moffatt, testimony, and that Moffat, the appellant, was asked the question, while on the stand, if there was any struggle outside of the tent, and he said: "No; not that he heard; that, as soon as Lay got out of the tent, he turned at once, and ran towards the river." The appellant insists that the testimony taken at the coroner's inquest, and reduced to writing, is presumed to contain all the testimony of the witness, and to be the best and only evidence of what he testified on that trial, and that the same cannot be contradicted or added to by parol testimony of what may have then occurred. This contention is in accord with the rule laid down by this court. Guy v. State, 9 Tex. Crim. App., 161; Dunlap v. State, Id., 179. The object of the State, in this regard, was to show that the witness had made statements, prior to the trial, contradictory to his statements on the final trial; and it did show by another witness, to-wit: Boyd, at a different time from the former examining trial, that appellant had made a statement to the effect that he heard no struggle on the outside of the tent after Pratt and Lay went out there. This was permissible, and it was competent for the State to introduce his evidence on the examining trial for the purpose of contradicting him; but it is not the rule that the State could either prove contradictory statements to that contained in the written evidence of the examining trial, made at the time, or that it could prove that appellant at that time made additional statements to those contained in said written testimony. The effect of this testimony was to discredit appellant, and was hurtful to him.

On the trial of the case it was shown that, at the instance of appellant, he was carried by a deputy sheriff to his home, and there changed his pants, the change being made in the cellar of appellant's mother's house, and the pants which he pulled off were thrown over on some old rubbish. This pair of pants, or perhaps two pair, that appellant had on at the time, it appears, were produced in evidence before the jury. Sheriff Metcalf was placed on the stand, and stated that he got the clothes from Jim Duncan. Boyd went to Clifton and got them. "When I first saw them in the office they looked like ashes had been smeared over them to hide the blood." Appellant objected to this testimony, but it was admitted over his objection, and he reserved his bill of exceptions thereto. Appellant contends that this testimony was not as to facts, but only gave the

opinion of the witness upon a matter that was very injurious to his rights. It will be observed in this connection that the appellant insisted that he had nothing to do with the killing of deceased, but that same was done by Lay alone; that when asked if he got any blood on him, or how he got the blood on him, he stated that he did not know, but that he must have got it in handling the body after he was killed, but that he tried not to get any on him. The fact that he did have blood on his pants was used by the State as a criminative circumstance to connect him with the homicide, and to this was added proof that he got rid of his pants as soon as he could, by changing them for another pair that was not bloody; and now to this is superadded the additional fact that appellant had smeared ashes over the bloody spots on his clothing to conceal the same—another material circumstance to the chain of criminative facts. It is conceded that it was entirely permissible on this line to trace the pants, and to prove the blood stains upon them, and to show that ashes were subsequently found on the blood stains, and the amount of said ashes, and how they were spread upon the pants in relation to the blood, whether they were thin or densely smeared. But this was not the character of the evidence. By the ruling of the court, the witness was permitted to give his opinion as to the purpose, as it appeared to him, for which the ashes were put upon the pants. We have examined the authorities on this question, and find none of them going to this extent. In Richardson v. State, 7 Tex. Crim. App., 486, the witness was permitted to state that certain bloody spots on a fence rail appeared to have been made with the hand. This was a statement merely as to the shape, and how said spots looked, but it · was no declaration as to the purpose for which said spots were placed there. In Powers' Case, 23 Tex. Crim. App., 42, the witness was permitted to state whether the pressure on his foot by another was done in an insulting manner or not. This was admitted under the rule that it was a manifestation of an emotion, such as fear, anger, and the like, or appearances not otherwise communicable. The case of Com. v. Sturtivant, 117 Mass., 122, goes further than any case of which we have any knowledge. On the trial under an indictment for murder, a witness familiar with blood, who had examined with a lens a blood stain on a coat, when it was fresh, and who testified to its appearance at the time he examined it, and that it was not in the same condition at the trial, was permitted to testify that its appearance when he examined it indicated the direction from which it came, and that it came from below upward, although he had never experimented with blood or other fluid in this respect. But even this case does not authorize the admission of this testimony where the witness is permitted to state his opinion of the purpose for which a certain thing was done. As stated, the fact of blood being on the clothes of appellant was a criminative circumstance, used against him; and the illegal testimony of the opinion of the witness as to why certain ashes were placed upon the blood spots, when it was not even shown that appellant was instrumental in putting the ashes there,

was, to our mind, calculated to injure his rights, and ought not to have been admitted.

On the trial of this case, the court charged murder of the first and second degrees, but did not charge upon manslaughter. A special charge on this subject was asked by appellant, and refused, to which appellant reserved a bill of exceptions. The two principal theories urged by the State and appellant, as before stated, were: First, the contention on the part of the State that the deceased was killed in pursuance of a conspiracy into which appellant entered with the others; second, it was urged by the appellant that the killing occurred in a sudden quarrel between Lay and the deceased, and that he did not participate at all in the homicide. Both of these views were presented to the jury in charges by the court. It does appear, however, that there is a phase of the case presented in the testimony on which the court should have given a charge on manslaughter. If the killing of deceased was done by Lay in a sudden quarrel, and not on account of any preconceived design to kill, and not in his necessary self-defense, but in sudden passion, produced by the assault made on him by deceased, then he could not be convicted of more than manslaughter; and, if appellant participated with him in such killing, it would be no more than manslaughter; or if appellant interfered in the difficulty between Lay and the deceased, in which the deceased was the aggressor, and such interference was not in pursuance of a previously formed design, and appellant and said parties participating with him used more force than was reasonably necessary for the protection of Lay, and thus slew the deceased, it would have been manslaughter. So, in our opinion, this phase of the case should have been presented to the jury. We think, also, that this testimony as to the purchase of the coffin by appellant should have been permitted by the court to be shown. For the errors discussed, the judgment is reversed, and the cause remanded.

*Reversed and Remanded.*