James Franklin **SADLER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 35137.

Court of Criminal Appeals of Texas.

Jan. 2, 1963.

Rehearing Denied Feb. 13, 1963.

Francis C. Richter, Hondo, for appellant.

J. Taylor Brite, Dist. Atty., Jourdanton, and Leon B. Douglas, State's Atty., Austin, for the State.

McDONALD, Judge.

The appellant was convicted for the offense of murder with malice aforethought, under an indictment alleging that he killed Lorene Taylor Hill by hitting her in the face and head with his hands and fists. His punishment was assessed at 15 years' confinement in the State penitentiary.

The evidence reflects that the deceased was a young girl, 22 years of age; that she weighed between ninety and one hundred pounds, not over 100 pounds, and that she was five feet in height, and shown by the testimony to have been a very small woman, very small bones and arms, not a fleshy person. The evidence adduced from the appellant's written statement without objection further reflects that she had been rather sickly, that she was subject to blackout spells and had low blood pressure, that she took medicine for her illness and that she had gone to several doctors in Rio Grande City, Zapata and Jourdanton.

The appellant was described, as shown by the testimony of Sheriff Dobbs, as being a man that would weigh a hundred and ninety pounds and was six feet two or six feet three inches in height; that he was a very strong man; that he had been an athlete, been a boxer fighting in the Golden Gloves tournaments; that he was around thirty years old.

The written statement of appellant reflects that he and the deceased had been living together for about 4 months, that she had been legally married to someone else during this time, that she had been separated for a long time, that they started living together on or about March 5, 1961.

The State's testimony reflects a series of acts of violence committed on the part of appellant against the person of the deceased, during the period of several months while the parties lived together out of wedlock.

Richard Lloyd Wilkinson, a witness for the State, testified that he was running Scottie's Blue Top in Jourdanton on the

day of the death of the decedent; that he saw appellant in this place of business with the deceased and another couple; that he heard a little commotion and saw appellant slap his wife completely out of the chair and onto the floor right at the side of the chair; that he wouldn't say it was a closed fist or what.

The appellant did not testify, but in his written statement he says that he went to the rest room (shown to be at Scottie's Blue Top) and when he returned the deceased and the others with them were gone; that they had gotten in the barbecue line; that this made him mad and he asked the deceased why they did not wait for him; that he told her she was supposed to do what he told her to do, and not what somebody else told her to do; that he and deceased had a few words; that he then got real mad and he hit her in the face with his hand one time; that it knocked the barbecue out of her hand; that she did not fall out of the chair when he hit her; that they then left the cafe and went to his father's home; that the deceased said she was tired and wanted to go to bed; that she went to bed and seemed to be crying or whimpering; that he went to see about her and subsequently he determined to take her to a doctor, going to his sister's home for a car, as his was about out of gas; that when he returned to his father's house the deceased was dead.

Dr. Robert Hausman, shown to be the medical examiner of Bexar County, a witness for the State, who performed the autopsy on deceased, described in detail that the deceased had evidence of bruises. The bruises consisted of some fresh bruises and some old bruises. There were bruises around the right eye, right upper and lower eyelids were discolored, and there was hemorrhaging in the white of the eye; the outside of the right eye in the white was hemorrhaged. The bruises of the right eye trailed all over the cheek as yellow discolorations, and it merged with other bruises over the side of the lower jaw, so

the right side of the face was bruised. There was a nail mark over the left eyebrow, two small hemorrhages in the right half of the lower lip in the inside of the lip; on the left side of the face, from the outer ridge of the eye socket to the ear there was a swelling and blue discoloration. The bruise of the left eye and the left temple was less than twenty-four hours old, possibly less than twelve hours old. The bruise of the right eye was older than 24 hours. There was a clot which covered the right half of the brain. The right half was filled with a clot which pressed on the brain, that this blood clot is *called a subdural hematoma,* meaning a collection of blood, and it compressed the right half of the brain and *it was the cause of death.* This subdural hematoma was caused by blunt force directed against the head. Dr. Hausman expressed the opinion that the subdural hematoma was brought about by blunt force injury directed to the left temple and to the left eye because they appeared about the same age. In addition to this hematoma, the brain showed some other injuries, too. Over the part of what we call the temporal, there were two areas of old bruising; that was in addition to the blood clot that he found overlying the right half of the brain. On sections of the brain itself, there was a small hemorrhage, also old, inside the brain matter. Also, there was evidence that part of the subdural hematoma was older than twenty-four hours. The doctor stated that he did not find anything that could have caused her death except for this fresh subdural hematoma; that the wounds he examined were caused by blunt force to the face, in this case two separate blows, one of which produced the black eye on the left and one which produced the black eye on the right; that on the inside of the dura mater there was evidence that there had been previously blood; that this was a matter of days, did not look that it was older than two or three weeks. The same held true for the bruising on the right side of the brain; that was also a matter of days and possibly weeks. All of those bruises and injury to

the brain in his opinion were not over three weeks old.

"Q. Dr. Hausman, I'd like to ask you a hypothetical question based upon your autopsy of this girl and what you found that you have testified here to before the jury. Now, assuming a few things that I will state to you, that approximately one week before you conducted this autopsy, a man of the weight of one hundred and ninety pounds, an ex-boxer, a strong man, struck this girl in the right eye with his hands and fists and then on approximately 8:30 P.M. of the night before you conducted this autopsy, that on the night of July the 4th at approximately 8:30 P.M. he again struck her in the face with his hands and fists sufficient to knock her out of a chair and on the floor, onto the floor, would such injury to the face of this girl and such force applied to the fists have created the subdural hematoma that you have described as resulted in her death?

"A. Yes, sir, it would in my opinion.

"Q. And if that did happen, Dr. Hausman, and with no evidence of anything else, would that in your opinion have caused her death from what you found?

"A. Yes, sir."

■ Appellant predicates his appeal on one contention; that is, that the evidence is insufficient to support the conviction in that there is a total lack of any evidence of an intent to kill, which is essential to the crime of murder. Appellant cites us two cases in his brief in support of his contention. The first case is Watson v. State, 148 Tex.Cr.R. 589, 189 S.W.2d 1020, and the other case is McDonough v. State, 147 Tex.Cr.R. 111, 178 S.W.2d 863. In Wat-

son's case, supra, the evidence reflected that the deceased was 24 years of age and weighed about 200 pounds, and the appellant was 36 years of age and weighed about 215 pounds; that appellant struck the deceased two or three licks about the chin and right side of the head in the region of the temple and as a result of these licks deceased crumpled or slumped to the pavement; that he was picked up, taken home, lapsed into unconsciousness and died of concussion of the brain about ten hours after the difficulty. As held by this Court in Watson, supra, "The intent to kill is either presumed or established by the facts. Where the instrument used—as in the instant case—is not one which, in the mode or manner of its use, is calculated to produce death or serious bodily injury, the burden is upon the State to establish, beyond a reasonable doubt, the intent to kill." There was no testimony in Watson's case, supra, suggesting antecedent grudges, ill-feeling or motive for appellant to kill, or desire to kill, the deceased. We feel that this Court in Watson's case, supra, no doubt gave serious emphasis to the relative size, age and strength of the parties in reaching its conclusion to reverse the case for want of sufficient evidence to support the conviction for murder.

■■ In McDonough's case, supra, this Court, speaking through Judge Beauchamp, said: "If the jury had any evidence from which they might find an intention to kill, their finding would be binding on this court. An utterance made by the appellant, *the relative size and strength of the parties,* the manner of the attack and the extent to which it was carried are all proper factors for consideration." It is interesting to note that *the relative size and strength of the parties* is not shown by the opinion in McDonough's case, supra, although it was a case of murder by striking and beating the deceased with his fist and by kicking him with his feet. We adopt the foregoing statement of Judge Beauchamp in McDonough, supra, for our holding that the jury had, in this case, evidence from which

they found an intention to kill, considering the relative size, weight and strength of the parties, and the jury's finding in this respect is binding upon this Court. Ray v. State, 160 Tex.Cr.R. 12, 266 S.W.2d 124. The question as to whether there was an intent to kill was for the jury. Ebers v. State, 129 Tex.Cr.R. 287, 86 S.W.2d 761; McNeill v. State, 128 Tex.Cr.R. 250, 80 S.W.2d 995; and Walker v. State, 94 Tex. Cr.R. 414, 251 S.W. 235.

We think that each case must necessarily turn upon its own facts, and prior cases are only useful to determine the dividing line. In each murder case affirmed by this Court, it necessarily finds sufficient intent to kill. Thus, in Medina v. State, Tex.Cr. App., 49. S.W. 380, continuous beatings and starvation showed an intent to kill. There was no one blow that could be pointed to as the cause of death. The Court held that it was competent to prove the prior beatings as evidence of the appellant's malice toward deceased. The conviction was upheld. In Phillips v. State, Tex.Cr.App., 216 S.W.2d 213, appellant and deceased got into a fight. Appellant struck deceased with his fist one to four times and then left him lying by a road. The Court said: "The facts, in our opinion, show such a disregard for human life as would justify the jury's conclusion that he intended to kill the deceased." Bell v. State, 149 Tex.Cr.App. 509, 196 S.W.2d 923, is almost four square on the facts with the case at bar. The appellant was charged with killing his wife by striking her with his fists. She appeared one day with a "bump" on her head and told her son that "Daddy caused it." There was evidence of prior violence by the husband on the wife. The case was reversed because the State failed to show that the blow was struck by the husband, but the opinion indicates (inferentially) no question in the court's mind as to intent—had the blow been shown.

We are of the opinion that the evidence is sufficient to sustain the jury's verdict. The judgment is affirmed.

MORRISON, Judge (dissenting).

The indictment was in three counts. The second and third charged negligent homicide under Article 1242, Vernon's Ann. P. C., in that appellant, while committing an aggravated assault and battery, he being a male and deceased being a female, through accident and mistake killed deceased by striking her in the face with his hands and fists. It is apparent from the way the indictment was drawn that there was serious doubt, in the minds of the prosecutor and the grand jury which returned the indictment, that the evidence was sufficient to support a conviction under the count charging murder. The facts, as I view them, amply support a finding of guilt under count two but do not support a conviction under the first count.

Sheared of all the gory details, we have here an unexpected death which resulted from a blow with the hand or fist administered in a public place by a sober person who made no utterance from which an intent to kill might be inferred and which grew out of a trivial disagreement.

A careful analysis of Dr. Hausman's testimony will reveal that, although he found evidence of two blows, he attributed the cause of death to one blow to the left temple and eye, which resulted in a hematoma. He said, "I did not find anything that could have caused her death except this fresh subdural hematoma." He further stated that a subdural hematoma may result from the application of a blunt force, a slight force or *no force at all,* and that because of an earlier disease which deceased had suffered, the residual effects of which he was able to detect from his autopsy, the deceased was more susceptible to formation of a hematoma. He further stated that when a man strikes a woman a blow on the side of the head "usually no hematoma will form."

I cannot agree that the fact that deceased went with appellant's brother and his wife to the barbeque line without waiting for

 

appellant was such a provocation as to give rise to an intent to kill or that appellant might reasonably foresee that death would follow. However reprehensible his conduct may have been, appellant is entitled to the full protection of the law and should not be held accountable for unforeseeable results.

Because this record, as I view it, does not support a verdict of murder with malice, I respectfully dissent. Authorities supporting my views appear in the footnote.[1]

1. Hill v. State, 88 Tex.Cr.R. 179, 225 S.W. 521; Jones v. State, 94 Tex.Cr.R. 471, 251 S.W. 1096; Hawkins v. State, 115 Tex.Cr.R. 163, 29 S.W.2d 384; Allison v. State, 131 Tex.Cr.R. 428, 99 S.W.2d 917; Parks v. State, 131 Tex.Cr.R. 464, 99 S.W.2d 943; Spivey v. State, 146 Tex. Cr.R. 11, 171 S.W.2d 140; McDonough v. State, 147 Tex.Cr.R. 111, 178 S.W.2d 863; Watson v. State, 148 Tex.Cr.R. 589, 189 S.W.2d 1020.